UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

CARMEN SIEGMUND,

                      Plaintiff,                       **MEMORANDUM AND ORDER**
                                                                               15-CV-129 (DRH)

      - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                      Defendant.

--------------------------------------------------------X

**APPEARANCES:**

**For the Plaintiff**:
Office of Christopher James Bowes
54 Cobblestone Drive
Shoreham, NY 11786
By:    Christopher James Bowes, Esq.

**For the Defendant**:
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
By:    Gail A. Matthews, Esq.

**HURLEY, Senior District Judge**:

       Carmen Siegmund ("Siegmund" or "Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner" or "Defendant"), denying her claim for disability benefits. Presently before the Court is the Defendant's motion for judgment on the pleadings affirming the Commissioner's decision to deny Plaintiff Social Security disability benefits as well as Plaintiff's cross motion for judgment on the pleadings vacating that decision and remanding this action for

additional administrative proceedings. For the reasons set forth below, the Plaintiff's motion is granted and the Defendant's motion is denied.

## BACKGROUND

### I. *Procedural Background*

Plaintiff applied for disability benefits under the Social Security Act ("SSA") on March 23, 2012. (Transcript ("Tr.") 20.) In the application, Plaintiff alleged that she was disabled since November 15, 2008 due to type II diabetes, diabetic neuropathy, high cholesterol, hypothyroidism, hypertension, and coronary artery disease. (Tr. 20, 23.) The Social Security Administration initially denied Plaintiff's application on May 23, 2012. (Tr. 20.) Thereafter, on August 7, 2012, Plaintiff requested a hearing before an administrative law judge ("ALJ.") (*Id.*) ALJ Seymour Rayner held the hearing on May 16, 2013. (Tr. 20, 29.) ALJ Rayner informed Plaintiff of her right to representation; however, Plaintiff chose to appear and testify without assistance from an attorney or any other representative. (Tr. 20, 39-40.)

The ALJ issued a decision on August 20, 2013, finding Plaintiff was not disabled within the meaning of the SSA. (Tr. 29.) Subsequently, Plaintiff retained an attorney and appealed the ruling to the Appeals Council ("AC") on September 17, 2013. (Tr. 15.) By notice dated November 7, 2014, the AC denied Plaintiff's request for review, thus finding that the ALJ's ruling became "the final decision of the Commissioner of Social Security . . . . " (Tr. 1; *see* 20 C.F.R. § 404.981 (1987) ("[T]he decision of the administrative law judge[,] if the request for review is denied, is binding unless you or another party file an action in Federal district court . . . .").) Thereafter, Plaintiff appealed the Commissioner's decision to this court.

### II. *Work History*

Plaintiff, born on June 3, 1961, was most recently employed as a pharmacy technician at a Waldbaum's grocery store from 2002 until 2008. (Tr. 35, 41, 92.) Plaintiff reported that during her Waldbaum's employment she worked five hours a day, four days per week. (Tr. 150.) Plaintiff noted that her duties included constantly walking back and forth, standing for five hours, stooping down for a half hour, writing, typing, or handling small objects for one hour, and frequently lifting less than ten pounds. (*Id*.)

### III. *Medical Evidence*

Medical evidence from many of the physicians that Plaintiff voluntarily saw throughout the period of her alleged disability is summarized below. Additionally discussed below is evidence from T. Bradshaw and Dr. Mary Lanette Rees, who provided medical reports at the request of New York state.

**A. Doctor Robert Dougherty**

In January 2005, Plaintiff was hospitalized overnight for chest pains. (Tr. 44-45, 412-413, 459.) Thereafter, Plaintiff saw Dr. Robert Dougherty, a cardiologist, regularly throughout 2005 and from 2010 through 2012. (Tr. 389-405; 406-17.) Notes from some of the Plaintiff's visits with Dr. Dougherty are summarized below.

Regarding a March 4, 2005 visit, Dr. Dougherty noted that Plaintiff reported she was feeling well and "she denie[d] any chest, arm, neck, or jaw discomfort, lightheadedness, dizziness, palpitations . . . ." (Tr. 409.) Additionally, Dr. Dougherty stated Plaintiff had no critical coronary artery disease ("CAD"). (*Id*.) On March 21, 2005, Dr. Dougherty had Plaintiff perform an Exercise Tolerance Test. (Tr. 411.) Plaintiff was only able to exercise for a total of three minutes and fifty seconds and had to stop due to shortness of breath. (*Id*.)

On January 4, 2012, Plaintiff met with Dr. Dougherty for a myocardial perfusion-imaging test. (Tr. 395.) The test required Plaintiff to exercise in order to test her heart rate, however, she was only able to exercise for four minutes and thirty seconds due to shortness of breath. (*Id*.) Dr. Dougherty noted the Plaintiff did not exhibit any stress-induced arrhythmias, and Plaintiff reported that she did not have any chest discomfort since her hospital evaluation for chest pains in November. (*Id* at 393.)

On February 6, 2012, Plaintiff met with Dr. Dougherty, who noted that the Plaintiff denied any further chest discomfort, but that she had chronic exertional shortness of breath. (Tr. 236.)

### B. Doctor Naim Abrar

On May 15, 2010, Dr. Naim Abrar, a board certified endocrinologist, noted that he had recently evaluated the Plaintiff, who was diagnosed with diabetes approximately two years prior to that date. (Tr. 195.) Dr. Abrar noted that Plaintiff had numbness and pain in her feet for the last six to eight months and that she sometimes exercised on a treadmill. (Tr. 195, 197.) Dr. Abrar's clinical impression of Plaintiff was that she had a history of early heart disease with uncontrolled type II diabetes, obesity, and primary hypothyroidism. (Tr. 196.) On June 25, 2010, Dr. Abrar diagnosed Plaintiff with Type II diabetes mellitus ("DM") (commonly referred to as diabetes), obesity, and hypothyroidism. (Tr. 198.)

### C. Doctor Jay Barbakoff

Pulmonologist Dr. Jay Barbakoff met with Plaintiff on November 28, 2011 for a pulmonary evaluation. (Tr. 264.) As a result of this visit, on December 14, 2011, Plaintiff underwent a PET scan, which revealed lung abnormalities. (Tr. 260-61.) A CT scan of Plaintiff's chest performed on February 9, 2012, revealed a nodule along the right lower lobe. (Tr. 240.)

### D. Doctor Daniel Hamou

On or around December 15, 2011, Dr. Daniel Hamou, an ophthalmologist, examined Plaintiff. (Tr. 115.) Dr. Hamou noted that her vision was 20/20 with corrective lenses and that Plaintiff had no limitations of physical activity. (Tr. 116, 118.) Dr. Hamou also stated, however, that he could not provide a medical opinion regarding Plaintiff's ability to do work-related activities. (Tr. 119.)

**E. Doctor Robert Bernard**

At the request of Dr. Robert Bernard, on January 6, 2012, a bone density assessment was performed on the Plaintiff and the results placed the patient in the "osteoporotic category" with a "[h]igh risk of fracture." (Tr. 304.)

**F. Doctor Evan Nadal**

Dr. Evan Nadal saw Plaintiff on May 16, 2012. (Tr. 464.) Dr. Nadal noted that Plaintiff's respiratory effort was normal, and her cardiovascular rate and rhythm were normal, along with her pulses. (Tr. 462.) Plaintiff possessed a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. (*Id.*) Dr. Nadal noted that Plaintiff had no sensory loss, her deep tendon reflexes were preserved and symmetric, she had no loss of vibration sense, and her feet were good. (*Id.*)

**G. Doctor Mark Gudesblatt**

On February 21, 2013, Plaintiff had an office visit with Dr. Mark Gudesblatt, a neurologist. (Tr. 485.) Dr. Gudesblatt noted that Plaintiff complained of ongoing frustration with "memory difficulties, fatigue with middle of the night awakening secondary to burning pain in the feet and legs." (*Id.*) Plaintiff reported that the burning pain in her feet spread up toward the ankles, causing intense pain. (*Id.*) She also reported that her symptoms were constant and that she had

ongoing burning pain in her hands. (*Id*.) Plaintiff also stated she had occasional imbalance, but no significant leg weakness. (*Id*.)

On June 7, 2013, Plaintiff had another office visit with Dr. Gudesblatt. (Tr. 483.) Plaintiff complained of ongoing frustration and moodiness, difficulty with short-term memory, ongoing sleep problems, fatigue, and burning pain in her hands and feet. (*Id*.) Plaintiff stated that these symptoms occurred daily and were uncontrolled. (*Id*.)

On June 24, 2013, Dr. Gudesblatt completed a letter, in which he stated that Plaintiff had "neurologic disability secondary to sarcoid, small fiber painful neuropathy, thyroid disease, sleep apnea as well as persistent fatigue and cognitive problems." (Tr. 487.) Dr. Gudesblatt noted that the small fiber neuropathy "resulted in weakness, painful numbness, [and] imbalance." (*Id*.) He stated that Plaintiff "should be considered disabled on the basis of her complex neurologic disorder and its sequela." (*Id*.)

**H. Physical Residual Functional Capacity Assessment**

On May 23, 2012, T. Bradshaw, a state agency disability analyst, provided a report of Plaintiff's Residual Functional Capacity ("RFC")[1] based on a review of Plaintiff's medical records. (Tr. 28, 465-70.) The report noted that Plaintiff could frequently lift and/or carry a maximum of twenty-five pounds; stand and/or walk for a total of six hours in an eight-hour work day; sit (with normal breaks) for a total of six hours in an eight-hour workday; and push or pull an unlimited amount. (Tr. 466.)

Bradshaw explained that although Plaintiff had a history of diabetes, a heart condition, and complained of leg and foot pain, no postural, manipulative, visual, communicative, or

---

[1] Residual functional capacity is defined as the "ability to do physical and mental work activities on a sustained basis despite limitations" from impairments. (*See* 20 C.F.R. § 416.945(a) (2012) ("Your residual functional capacity is the most you can still do despite your limitations").)

6

environmental limitations had been established. (*Id*.) Bradshaw also noted that Plaintiff was able to do light chores, attend to personal activities, travel alone, and did not use an assistive device for ambulation. (Tr. 468.) Bradshaw stated that evidence in the file did support some limitations, however, these "allegations [were] found to be [only] partially credible." (Tr. 468-69.)

**I. State Agency Medical Consultant Dr. Rees**

On October 10, 2012, Dr. Mary Lanette Rees, a state agency medical consultant, provided a report upon review of Plaintiff's medical records. (Tr. 28, 471.) Dr. Rees stated she agreed with the RFC assessment from Bradshaw and found Plaintiff was able to perform her past relevant work. (Tr. 471.)

*IV. Testimonial Evidence*

At the hearing with the ALJ, Plaintiff stated that she had Type II diabetes, a heart condition, sarcoidosis granuloma, Hashimoto's disease, and that her neurologist believed that she had MS. (Tr. 46.) She stated that she could barely shower and that she could not stand. (Tr. 47.) She testified, however, that she could comb her hair, dress herself sometimes, buckle a belt, put on a coat, usually button the buttons on a blouse, zip up zippers, tie a bow, and sometimes pull a blouse over her head. (Tr. 48-49.) Although she occasionally washed dishes, Plaintiff stated that she could not go food shopping, do the laundry, sweep the kitchen, or mop the floor, vacuum, take out the garbage, or drive. (Tr. 48-52.) Plaintiff stated she could open an envelope, pay bills, eat with a knife and fork, hold a cup of tea with two hands, open the doors to her house, and open the doors to her car. (Tr. 50-51.) Plaintiff said she did not smoke, take public transportation, or wear a neck brace. (Tr. 53.)

7

Plaintiff said she could stand for only under an hour and could walk for only a half hour until it became "shear [sic] will." (Tr. 54.) She said she could sit for "maybe an hour, hour and a half" and could lift twenty-five pounds at a time. (Tr. 54-55.)

## DISCUSSION

**I.** *Standard of Review*

**A.** *Review of the ALJ's Decision*

In reviewing a decision of the commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks omitted). "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 404(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004). Thus, the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits is "based on legal error or is not supported by substantial evidence." *Rosa,* 168 F.3d at 77.

**B.** *Eligibility for Disability Benefits*

To be eligible for disability benefits under the SSA, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable

8

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . " *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa,* 168 F.3d at 77 (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003).

**II.**     ***The ALJ's Decision***

Applying the five-step analysis detailed in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff satisfied the first two steps of the analysis: (1) Plaintiff had not engaged in substantial gainful

9

activity since November 15, 2008; and (2) Plaintiff's alleged diabetes mellitus, hypothyroidism, non-obstructive coronary artery disease, small fiber neuropathy, and hypertension constituted severe impairments. (Tr. 22.) However, the ALJ determined that Plaintiff's high cholesterol did not significantly affect her capability to perform work related activities. (*Id.*) Additionally, the ALJ determined that "the record . . . [did] not document any diagnosis of diabetic neuropathy." (*Id.*)

The ALJ then moved on to step three and found that Plaintiff did not have an impairment or a combination of impairments that met or equaled one of the impairments listed in Part 404, Subpart P, Appendix 1 of the regulations. (Tr. 22.)

Next, the ALJ found that Plaintiff had "the residual functional capacity to perform the full range of light work . . . ." (Tr. 23.) Light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). The ALJ based this determination on a finding that although Plaintiff's medically determinable impairments could cause the alleged symptoms, Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (Tr. 24.) The ALJ also noted that his decision was "supported by the opinions of Dr. Rees and Dr. Hamou, as well as the objective medical evidence, and the testimony and statements of the claimant." (Tr. 28.)

Lastly, the ALJ determined Plaintiff was able to perform her past relevant work as a pharmacy technician. (*Id.*) The ALJ determined that Plaintiff's own description of her work as a pharmacy technician met the definition of light work. (*Id.*) Additionally, the ALJ found that the Dictionary of Occupational Titles characterized pharmacy technician work "as light in exertional nature." (*Id.*) Therefore, the ALJ determined Plaintiff was able to perform her past relevant work and was not disabled as of November 15, 2008. (*Id.*)

### III. *The Parties' Arguments*

The Defendant argues that the decision of the ALJ should be affirmed because "it is legally correct and [is] supported by substantial evidence." (Def.'s Mem. in Supp. at 1.) Plaintiff, however, argues as follows:

> [T]he decision to deny her claim for benefits must be reversed where the administrative law judge . . . failed to discharge his duty to affirmatively develop the medical evidence of record by either seeking reports from [Plaintiff's] treating physicians or, at minimum, advising [Plaintiff] of the importance of a treating physicians' report and advising her to attempt to secure the reports on her own. Moreover, the ALJ's determination that [Plaintiff] retained the capacity for light work, and the five hours of standing and walking required of her past relevant work as a pharmacy technician, is not supported by substantial evidence where the ALJ relied on a non-examining agency review physicians [sic] and a report from a treating ophthalmologist, who emphatically stated that he could not provide a physical work assessment for [Plaintiff].

(Pl's Mem. in Supp. at 1). The Court will first address Plaintiff's argument regarding the ALJ's duty to develop the record.

"[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history" irrespective of whether the claimant has counsel. *Rosa*, 168 F.3d at 79. Moreover, if the claimant is unrepresented by counsel, "the ALJ has a duty . . . to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts . .

. ." *Hankerson*, 636 F.3d at 895 (internal citation and quotation marks omitted). Further, where the claimant proceeds pro se, "the reviewing court has a duty to make a searching investigation of the record to ensure that the claimant's rights have been adequately protected." *Id.* (internal citation and quotation marks omitted).

Pursuant to the Code of Federal Regulations, "the lack of a statement from plaintiff's treating source regarding how plaintiff's impairments affect his or her ability to perform work-related activities will not render a [record] incomplete." *Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (citing 20 C.F.R. § 404.1513(b)(6)). "However, the regulations also provide that the Commissioner will first request such a statement." *Id*. (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("[B]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request such reports.")). Moreover:

> Because the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder,[2] it is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician – what distinguishes him from the examining physician and from the ALJ – is his opportunity to develop an informed *opinion* as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician. It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference. Thus, when the claimant appears pro se, the

---

[2] Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

12

> combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.

*Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991); *see also Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir. 1980) (holding that ALJ erred when he failed to explain to plaintiff that he should obtain a more detailed statement from the treating physician).

Here, given the lack of reports setting forth the opinion of Plaintiff's treating physicians as to her RFC, the ALJ was required to make reasonable efforts to obtain such reports. However, there is nothing in the administrative record indicating that the ALJ did so. It is clear from the transcript of the hearing that the ALJ knew that Plaintiff was under the primary care of at least Dr. Nadal and previously had been under the primary care of Dr. Bernard. (Tr. 43-44.) The requests for assessments from Drs. Nadal and Bernard that the Commissioner points to in the record (Def.'s Reply at 4) are actually requests that were made not by the ALJ, but by the New York State Office of Temporary and Disability Assistance on April 18, 2012. (Pl.'s Reply at 2.) Although the ALJ stated at the hearing that the record would be held open for another month, he never specifically directed Plaintiff to obtain opinions from her treating physicians. (Tr. 56.) Furthermore, the fact that the ALJ relied on the RFC assessment of Dr. Hamou, does not persuade the Court that there was sufficient treating physician opinion evidence before the Court such that the ALJ was not required to request further such evidence. Dr. Hamou specifically stated in his report that he could not "provide a medical opinion regarding [plaintiff's] ability to do work-related activities," (Tr. 119), and so the ALJ was required to request such an opinion from a treating physician who could provide one.

The Commissioner points out that "even when Plaintiff did obtain a letter opinion from Dr. Gudesblatt and submitted it to the Appeals Council, with the assistance of counsel, she did not obtain a detailed assessment concerning her functional abilities from Dr. Gudesblatt." (Def.'s Reply at 4.) This fact, however, does not exempt the ALJ from the requirement that he request such an assessment from Plaintiff's treating physicians.

### IV. Assessment of Credibility and Plaintiff's Subjective Testimony

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding his symptoms when analyzing whether he is disabled. *See* 20 C.F.R. § 404.1529(a) (2011). In order to evaluate a claimant's subjective testimony regarding his symptoms, first, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the claimed symptoms. *See* SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996). Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id*. Moreover, if a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight." *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992) (internal quotation marks omitted).

While assessing Plaintiff's credibility, the ALJ concluded that Plaintiff's "impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." However, should the ALJ receive further medical reports upon request, he should consider whether this new evidence alters his assessment of Plaintiff's credibility. *Johnson*, 811 F. Supp. 2d at 631.

## *CONCLUSION*

For the reasons set forth above, the Commissioner's decision to deny Plaintiff social security benefits is vacated and this case is remanded for further proceedings consistent with this Memorandum and Order. Specifically, on remand, the ALJ must request RFC assessments from Plaintiff's treating sources. Then, the ALJ must reassess Plaintiff's RFC taking into account any RFC assessments provided in response to his request, in accordance with the applicable regulations. In addition, the ALJ should also consider whether his reevaluation of the evidence alters his assessment of Plaintiff's credibility. Finally, the Court notes that the ALJ mistakenly stated that Plaintiff testified that she could walk for one and a half hours, (Tr. 28), whereas Plaintiff actually testified that she could sit for "maybe an hour, hour and a half." (Tr. 54). On remand, the ALJ should consider the correct testimony.

**SO ORDERED.**

Dated: Central Islip, New York
June 2, 2016               _____/s/_____

                           Denis R. Hurley
                           Unites States District Judge